UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TIMELINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| FACEBOOK, INC., | ) | Case No. 11-cv-6867 |
| | ) | |
| Defendant. | ) | Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Timelines, Inc., filed a Complaint against Defendant, Facebook, Inc., on September 29, 2011, alleging four counts of federal and state trademark and false practices violations. Plaintiff sought a temporary restraining order to bar Defendant from offering a service on its website called "Timeline"; this motion was denied. (Dkt. No. 16.) Plaintiff amended its Complaint on October 8, 2011, alleging six counts against Defendant: (I) and (II) reverse and direct trademark infringement, in violation of 5 U.S.C. § 1114; (III) false designation of origin, in violation of 15 U.S.C. § 1125(a); (IV) unfair competition under the Lanham Act and common law; (V) unlawful conduct under the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2; and (VI) unlawful conduct under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2. Defendant answered the Amended Complaint and asserted two Counterclaims against Plaintiff, seeking: (I) a declaration of non-infringement on the part of Defendant and (II) cancellation of Plaintiff's registered marks and a declaration of express abandonment of Plaintiff's then-pending trademark application with the U.S. Patent and Trademark Office ("PTO").

Discovery closed on September 28, 2012, and Defendant filed a motion, seeking summary judgment on each of Plaintiff's claims and both of Defendant's counterclaims. This

motion has been fully briefed and is ripe for ruling. The case is set to proceed to trial before a jury on April 22, 2013.

## BACKGROUND

Local Rule 56.1(a)(3) requires a party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue . . . ." Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny each factual statement proffered by the moving party and concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in an opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Local Rule 56.1(b)(3)(C) further permits the non-movant to submit additional statements of material facts that "require the denial of summary judgment . . . ."

To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact which relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

The following facts[1] are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[2]  Defendant is a corporation organized under the laws of the State of Delaware, with its principal place of business in Menlo Park, California. (Def.'s SOF ¶ 1.)  Plaintiff, also a Delaware corporation, has its principal place of business in Chicago, Illinois.  (*Id.* ¶ 2.)  Subject matter jurisdiction is proper pursuant to the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338, with proper supplemental jurisdiction over the state law claims under 28 U.S.C. § 1267(a).  (*Id.* ¶ 3.)  Defendant concedes personal jurisdiction is also proper in this District, and the parties agree venue is proper in this district pursuant to 28 U.S.C. § 1391(b).  (*Id.* ¶¶ 3-4.)

*Plaintiff's Goods and Services*

Plaintiff was founded in January 2007.  (Pl.'s SOF ¶ 1.)  Plaintiff launched its website, Timelines.com, in April 2009.  (Def.'s SOF ¶ 7.)  Plaintiff operates two websites, Timelines.com and LifeSnapz.com; two applications, "Photogram" and "Disaster of the Day"; and an application services provider called "Timelines SE," which has a graphical timeline.  (Pl.'s SOF ¶¶ 2, 23.)

Through Timelines.com, a user "can record the details of events, connect them in space and through time to other related events, and contribute to a better collective understanding of

---

[1] Admitted Statements of Material Facts by Defendant are designated as "Def.'s SOF," with the corresponding paragraph referenced; Plaintiff's Additional Admitted Statements of Material Facts are designated as "Pl.'s SOF," with the corresponding paragraph referenced.

[2] Plaintiff's motion to file statements of additional facts beyond the forty permitted by Local Rule 56.1(b)(3)(C) was granted *nunc pro tunc* on February 28, 2013.

what occurred at a particular place and time." (Def.'s SOF ¶ 5.)[3] Timelines.com uses

"timelines, maps and lists to enable unique ways for readers to explore and learn about topics."

(*Id.* ¶ 6.) Anyone can access and post content to Timelines.com by creating a user account.

(Pl.'s SOF ¶ 3.) A Timelines.com user can record a personal or historic event, such as a child's

birthday party or a presidential inauguration. (*Id.* ¶ 4.) Then, other users can add additional or

new content for that event. (*Id.*) For example, USER A, a student, accesses Timelines.com and

posts information about the American Civil War; thereafter, USER B, a professor with no

relation to USER A, may also access the website and post additional information about the Civil

War. (*Id.*) Plaintiff's total sales during the past three years are approximately $87,000. (Def.'s

SOF ¶ 46.) Timelines.com has 1,209 registered users. (*Id.* ¶ 47.) In 2011 and 2012,

Timelines.com averaged approximately 94,000 visitors per month. (Pl.'s SOF ¶ 15.)

   Plaintiff also offers services through another website, Lifesnapz.com, which is aimed at

families, to allow them to share and record events with those designated people with whom they

would like to share. (Pl.'s SOF ¶ 5.) On its "About Us" webpage, Plaintiff explains that

"LifeSnapz is a free, easy and secure way for people to record and organize important events,

milestones and memories in their lives. Users of LifeSnapz can contribute text, photos, and video

to describe these events, share them with self-designated groups (like family members,

---

[3] Plaintiff objects to the admission of statements from its own website, Timelines.com, asserting that the statements have not been properly authenticated. However, Federal Rule of Evidence 901 governs the authentication of evidence and provides that the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Defendant's affidavit is sufficient to support a finding of authentication; and, at the time of the writing of this opinion, it is apparent that the content still exists online as Defendant describes.

colleagues, schoolmates or youth sports teams) and explore these events using dynamic

timelines, maps, and lists." (Def.'s SOF ¶ 8.) The website for LifeSnapz further provides that:

> The timeline feature lets you visualize your events across time, and the map feature provides a unique way to visualize your events across a town, state, country or the world. Additionally, timelines and maps can be instantly customized based on who was at an event and how the event was tagged. With this feature, you can easily find the types of events and people you are looking for and create instant timelines and maps based on them.

(*Id.* ¶ 9.) Lifesnapz.com has a timeline, and the term "timeline" as it is used on the website is

used in a generic sense, to describe the graphical representation employed on the site. (Pl.'s SOF

¶ 23.)

### *Registration of Plaintiff's Marks*

Plaintiff has invested millions of dollars in its business. (*Id.* ¶ 19.) Plaintiff owns Federal

Trademark Registration Numbers 3,684,074 for "Timelines"; 3,764,134 for "Timelines.com";

and 3,784,720 for its "Timelines" design mark. (*Id.* ¶ 9.) Plaintiff filed its first application for

the "Timelines" mark on May 23, 2008; its first use was September 15, 2008; its first use in

commerce was on April 20, 2009, and its subsequent registration for "TIMELINES" was issued

on September 15, 2009. (*Id.* ¶ 11.) Plaintiff filed for the Timelines.com mark on May 23, 2008;

it was first used on September 15, 2008; it was first used in commerce on April 20, 2009; and the

registration date was March 23, 2010. (*Id.* ¶ 12.) The "Timelines" design mark was filed on

October 5, 2009; first used (and first used in commerce) on April 20, 2009, and it was registered

on May 4, 2010. (*Id.* ¶ 13.) The Timelines Mark is registered in the PTO's International Class

42, which relates to goods or services including scientific and technological services and

research and design relating thereto. (Pl.'s SOF Ex. 4.) The mark was issued for "providing a

web site that gives users the ability to create customized web pages featuring user-defined

information about historical, current and upcoming events; and application service provider, namely, managing web sites of others in the fields of historical, current and upcoming events." (*Id.*)

On September 26, 2011, Plaintiff filed an application with the PTO to register "Timelines" with a broader description of services than it provided in its first application, based, in part, on services identified in Facebook's own trademark registrations. (Def.'s SOF ¶ 40.) This description of services associated with the application was more expansive than the description of services relating to the previously issued trademark for "Timelines." (*See* Pl.'s SOF Ex. 4; Def.'s SOF Ex. 63.) The PTO refused to register Plaintiff's alleged mark, on the basis of its descriptiveness. (Def.'s SOF ¶ 41.) The PTO Examining Attorney stated that "[i]n this case, the wording 'timelines' as applied to the applicant's web-based software services describes a feature, characteristic and function of those services." (*Id.* ¶ 42.) Plaintiff did not file a response to the PTO's refusal, and the PTO deemed Plaintiff's application abandoned. (*Id.* ¶ 43.)

Since Plaintiff was granted "Timelines" in 2009, the PTO has granted other trademark registrations for marks incorporating the term "timeline or "timelines," including, "THE TIMELINE OF YOUR LIFE." (Pl.'s SOF ¶ 65.) These other marks were issued for six different classes, including for services such as software applications for social networking and photo sharing. (*Id.*)

*Plaintiff's Use of Marks at Issue*

Plaintiff uses its registered marks in connection with its goods and services and has used these marks to promote its business since September 15, 2008. (Pl.'s SOF ¶¶ 10, 14.) It promotes its business through the use of social media and by posting events of the day. (*Id.* ¶

6

16.)  Plaintiff also maintains a Facebook page at www.facebook.com/timelines.  (*Id.* ¶ 17.)
Plaintiff has received awards and recognition for its services, including an Open Web Award
nomination, a Mashable.com recommendation for web-savvy families, and a selection as a
finalist for the 2010 Chicago Innovation Awards.  (*Id.* ¶ 18.)

Prior to initiating this suit, Plaintiff's Timelines.com website included a webpage entitled
"Popular Timelines," which identified at least thirteen different categories of "timelines" like
"Timelines of Famous People" and "Timelines of Wars and Conflict."  (Def.'s SOF ¶ 16.)
Plaintiff's site also used the term "timeline" in the names of its arrangements of information in
chronological order, such as "Amelia Earhart Timeline."  (*Id.*)  A representative for Plaintiff
acknowledged that "[t]he noun 'timeline' refers to a chronological organization of events or
other information."  (*Id.*)

After this suit commenced, Plaintiff removed the "Popular Timelines" page from its
website, replacing it with a "Popular Topics" page.  (*Id.* ¶ 17.)  Plaintiff also removed the term
"timelines" from other portions of its website.  (*Id.*)  Plaintiff explained that it had included the
phrase "Popular Timelines" to its website to increase Search Engine Optimization, which in turn
increased traffic to its website.  (Pl.'s SOF ¶ 22.)  After the Search Engine Optimization benefit
leveled off, Plaintiff removed the phrase from its site.  (*Id.*)

*Third Parties' Use of Terms at Issue*

The term "timeline" is defined in numerous dictionaries, such as the American Heritage
Dictionary, Merriam Webster's Collegiate Dictionary, and Wikipedia.  (Def.'s SOF ¶ 12.)  The
PTO itself uses the term "timelines" generically on its website, referring to its "Trademark
Application and Post-Regulation Process Timelines."  (*Id.* ¶ 15.)

Other third parties have also used the term "timelines" generically. (*Id.* ¶ 23.) Tom Snyder Productions has offered its Timeliner product since 1987, which is "educational software that's delivered on a CD that allows teachers or students in their class to type in dates and facts and the computer will create a scaled timeline that you could print out;" using the term "timeline" to describe the Timeliner, "because the program creates timelines, so it would be natural to use the word 'timeline . . . .'" (*Id.* ¶ 30.) International Reading Association has offered a "web-based Timeline Tool" since approximately 2003, identifying the tool as the "Timeline Tool" because "[i]t creates a timeline." (*Id.* ¶ 31.) SmartDraw has offered timeline creation software since 1996 and uses the term "timeline" in descriptions of its software because it is "descriptive of the feature;" similarly, Mnemograph LLC offers web-based timeline software and also uses the term "timeline" as a descriptor of its software. (*Id.* ¶¶ 32-33.) MIT developed a timeline software program in 2006 and uses the term "timeline" to describe its software. (*Id.* ¶ 34.) MIT uses the term because the software displays a timeline, and if MIT were prevented from using the term, it would be unable to properly convey the purpose of the software. (*Id.*)

Witnesses on behalf of these companies have stated their companies would be at a disadvantage if they were not permitted to use the term "timeline" to identify or describe their goods or services. (*Id.* ¶ 36.) These companies further declare they are unaware of instances of confusion arising from their use of the term "timeline(s)" in connection with their goods and services and that neither Plaintiff nor any other third party has objected to their use of the term "timeline(s)." (*Id.* ¶ 37.)

Despite the generic use of the term "timeline" by these third parties, Plaintiff explains it was not concerned with the other parties' use of the term in the generic sense because Plaintiff

"does not use the term in such a manner" and because the other "timelines" are static. (Pl.'s SOF

¶¶ 24, 59.) Moreover, Plaintiff distinguishes itself from some of the third parties, because the

other parties' goods or services are software-based, while Plaintiff's Timelines.com is web-

based. (*Id.* ¶ 62.) Many of these other software companies require payments, though

Timelines.com is free to use. (*Id.* ¶ 63.)

*Defendant's Use of Terms at Issue*

Defendant's own name, Facebook, was derived from the generic college yearbooks that

were known as face books. (*Id.* ¶ 55.) Defendant's website, Facebook.com, includes a

"Timeline" feature, which can include a summary of a user's life since birth, using updates made

to a user's profile on the website. (Def.'s SOF ¶ 48.) While logged on Facebook, a user can

navigate this feature, as well as other features, including "Map," "Friends," "Photos," and

"Events," using a drop-down menu. (*Id.* ¶¶ 49-50.) Facebook does not use any trademark

symbols in connection with its use of the term "Timeline." (*Id.* ¶ 52.) Facebook does not charge

users to use "Timeline." (Pl.'s SOF ¶ 50.)

Defendant admits it was aware of Plaintiff prior to announcing Facebook Timeline and

had begun development of its "Timeline" feature as early as October 2010. (*Id.* ¶ 25.) In

considering use of the term "Timeline," Defendant noted that using the term presented a good

Search Engine Optimization opportunity for Facebook.com, with one Defendant employee

commenting that Facebook would "dominate" the Search Engine Optimization "shortly." (*Id.* ¶

27.) Defendant's founder and Chief Executive Officer, Mark Zuckerberg, made the final

decision to call the new product "Timeline." (*Id.* ¶ 25.) In advance of Defendant's development

conference, the f8 Conference, to be held in September 2011, Zuckerberg stated Defendant

"decided to focus in two places: all the stuff we want to do (products), and also wanted to punch

9

anyone who tried to compete with us in the face really hard.  You have to teach people who compete with you 'don't even fucking bother.'"  (*Id.* ¶ 26.)

Defendant regularly refers to its "Timeline" feature as a product.  It is called a "product" in statements Defendant filed with the Securities and Exchange Commission relating to its Initial Public Offering ("IPO").  (*Id.* ¶ 33.)  Defendant's Director of Product Placement and its Vice President of Product Marketing both consistently refer to Facebook's "Timeline" as a product. (*Id.* ¶¶ 34-35.)  Defendant describes the Timeline product as a chronological expression of information that a Facebook user has entered into Facebook.  (*Id.* ¶ 36.)  To users, Facebook describes Timeline as "your collection of photos, stories and experiences that tell your story." (*Id.* ¶ 37.)

Defendant has applied for and registered several marks with the PTO, including: "WALL," "POKE," "LIKE," "FACEBOOK," and "FACE."  (*Id.* ¶ 57.)  When other entities have sought to register or use a term close to Defendant's registrations, such as "WALL" or terms using "BOOK" (like "TEACHBOOK" or "SHAREWALL"), Defendant has actively opposed the actions of these entities and protected its marks.  (*Id.* ¶ 56.)

Prior to the f8 Conference, Zuckerberg emailed other Facebook employees, remarking, "we need to lock down the names of different parts of the product . . . [w]e need to start locking down all the terminology surrounding timeline . . . ."  (*Id.* ¶ 42; Pl.'s SOF Ex. 17.)  Zuckerberg continued:

> (1) Timeline.  This is the most important brand.  It describes the entirety of the new product we're rolling out and not just the main tab itself.  Timeline will also replace the word "profile" across the whole product as the brand/word describing this product.  From now on, rather than editing your profile, you edit or update your timeline.

10

(*Id.* ¶ 42; Pl.'s SOF Ex. 17.)  In online, internal discussions about the "Timeline" terminology, Zuckerberg commented, "I also really like the concept of having this and a bunch of the other concepts be modifiers of Timeline.  So this could be 'Timeline Views,' the scrubber could be the 'Timeline Expander', the spine could be the 'Timeline Spine' or whatever we call that." (*Id.* ¶ 47; Pl.'s SOF Ex. 22.)  In preparation for Zuckerberg's presentation at the f8 Conference, he created an outline of his presentation slides, writing, "Introduce Timeline and the three main messages.  (First, a slide that just says 'Timeline' big in the center and then subtext 'Your life on a page' or whatever the tagline ends up being.  Then the title, Timeline, moves to the top of the slide to make room for the three main points . . . ." (*Id.* ¶ 45.)  Zuckerberg continued in his outline:  "Show Timeline. (Slide with my full timeline on it, starting at the top, waiting for a moment and then scrolling back in time at increasing speed until we reach the bottom.)." (*Id.* ¶ 46.)

At Defendant's fourth annual f8 Conference, Zuckerberg introduced Facebook's new Timeline in his live presentation.  (*Id.* ¶ 29.)  The precursor to "Timeline" was a user webpage on Facebook called the "Wall."  (*Id.* ¶ 30.)  Defendant trademarked the term "Wall."  (*Id.*)  Defendant intended to replace Facebook's "Wall" feature with "Timeline."  (*Id.* ¶ 25.)  At the f8 Conference, Zuckerberg announced the new Timeline feature of Facebook, describing it as "the heart of your Facebook experience."  (*Id.* ¶ 31.)  Zuckerberg explained that "Timeline" was just like the "Wall" but "much more nicely designed."  (*Id.*)  Throughout Zuckerberg's presentation, the word "Timeline" appeared on a screen behind him, presented with a capital "T."  (*Id.*)  The screen also flashed the phrase "Introducing Timeline," again using a capital "T."  (*Id.* ¶ 32.)  After the f8 Conference, Defendant prepared a summary of the conference for marketers, explaining, "During Facebook's f8 conference, we announced a set of products that will help

people and their friends connect to the things they care about in even deeper ways" and described Facebook's Timeline as a "new kind of profile . . . ." (*Id.* ¶ 44.)

Following the introduction of Facebook's "Timeline" at the f8 Conference, Defendant prepared an internal PowerPoint presentation to review the rollout of the Facebook Timeline, stating that "[Facebook] owned the industry discussion" and presented news headlines from media outlets, such as "Facebook Timeline Review: This is the Greatest Thing Facebook's Ever Done." (*Id.* ¶ 39.) A marketing video created for or by Defendant demonstrates the features of Facebook's Timeline, concluding with a screenshot that simply says "Introducing Timeline." (*Id.* ¶ 48.) In a Roadshow Video marketed to potential investors in connection with Defendant's IPO, the Facebook team explains, "Facebook helps you share what's important to you and see what's going on in the lives of the people that you care about. Two of the most critical tools for doing that are Timeline and Newsfeed. Timeline is really the story of your life on a single page. And you know, because it's tied to you, and your friends, and real dates, I think it ends up being a very clear picture of the important things that happened in a person's life." (*Id.* ¶ 49; Pl.'s SOF Ex. 24.)

After Defendant introduced the "Timeline" feature, changes were made to Facebook.com, causing people searching for *Plaintiff's* Facebook page to instead be directed to the *Facebook* Timeline page. (*Id.* ¶ 40.) This redirection to the Facebook Timeline page instead of Plaintiff's page occurred for at least a week and was corrected after the commencement of this lawsuit. (*Id.*)

When Defendant announced its "Timeline" feature, people familiar with Plaintiff were confused by the announcement and believed Plaintiff had made an agreement with Defendant. (*Id.* ¶ 53.) Other individuals, under the impression that Plaintiff was related to Defendant's

website, Facebook, personally contacted Plaintiff to change their settings on Facebook. (*Id.* ¶ 54.)

*Survey Evidence*

Dr. Deborah Jay conducted a *Teflon* model survey[4] on behalf of Defendant to determine the primary significance of the terms "timeline" and "timelines" among individuals age 14 and older who had accessed or were likely to access a social networking website or a site where a user could record events and contribute descriptions, photos, videos, and links to related events. (Def.'s SOF ¶ 38.) Only respondents who demonstrated they understood the difference between a brand name and a common name participated in the substantive portion of the survey. (*Id.*) In this survey, 68 percent of respondents expressed a belief that the term "timeline" was generic (not a brand) when asked whether "timeline" was a common name or a brand name in connection with a website or website feature; 69 percent of respondents felt the same way about the term "timelines", and 24 percent of respondents believed the terms "timeline" and "timelines" were brand names. (*Id.* ¶¶ 38-39.) Plaintiff disputes the validity of this survey.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.*

---

[4] A "*Teflon* Survey" is a genericness survey model, named as such because it was employed to "prove that TEFLON was not a generic name. A '*Teflon* Survey' is essentially a mini-course in the generic versus trademark distinction, followed by a test." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:16 (2006).

*v. Catrett*, 477 U.S. 317, 323-24 (1986) (*Celotex*). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but, rather, "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not enough to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp*., 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (*Abdullahi*) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

Defendant moved for summary judgment in its favor on all of Plaintiff's claims alleged in its Amended Complaint, as well as on Defendant's two counterclaims. In support of Defendant's motion, Defendant first contends that the Plaintiff is not entitled to trademark rights in "Timelines" because it is either a generic term or merely a descriptive term, without secondary meaning. Defendant further argues it makes fair use of the term "timeline" and cannot be liable for infringement as a matter of law.

*Generic and Descriptive Marks*

Trademarks "are classified into five categories of increasing distinctiveness:      1) generic, 2) descriptive, 3) suggestive, 4) arbitrary, and 5) fanciful." *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996) (*Mil-Mar*) (citations omitted). The strength of the trademark and the protection it is afforded corresponds with the distinctiveness of the mark; the more distinctive the mark, the stronger it is and the more protection it receives. *Mil-Mar*, 75 F.3d at 1156. "Consequently, generic terms receive no trademark protection; descriptive marks are protected only if the mark has achieved 'secondary meaning' in the relevant community; and suggestive, arbitrary, and fanciful marks are deemed inherently distinctive, and thus entitled to full protection." *Id.*

When a trademark has been registered with the PTO, under the Lanham Act, it is entitled to a presumption of validity; that is, a registered trademark is presumed to not be merely descriptive or generic; or, if descriptive, the mark has secondary meaning. 15 U.S.C. § 1115(a); *Facebook, Inc. v. Teachbook.com, Inc.*, 819 F. Supp. 2d 764, 776 (N.D. Ill. 2011) (*Teachbook*). This is a rebuttable presumption; a defendant bears the burden of showing proof that a mark is either generic or merely descriptive and, therefore, not entitled to trademark protection. *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936-37 (7th Cir. 1986).

In ruling on a summary judgment motion in a trademark case, the classification of a mark, the determination of a defendant's use of a mark in good faith, and a finding of consumers' likelihood of confusion relating to the mark are questions of fact. It is possible for these issues to be resolved on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Packman v. Chicago Tribune Co.*, 267

F.3d 628, 637 (7th Cir. 2001) (*Packman*) (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83

F.3d 169, 171 (7th Cir. 1996)).

*No Showing that Plaintiff's "Timelines" is Generic as a Matter of Law*

"A generic term is one that is commonly used to name a type or kind of good." *Hickory*

*Farms, Inc. v. Snackmasters, Inc.*, 500 F. Supp. 2d 789, 793 (N.D. Ill. 2007) (*Hickory Farms*)

(citations omitted). A trademark can become generic when it goes so near to "becoming the

exclusive descriptor of the product that sellers of competing brands cannot compete effectively

without using the name to designate the product they are selling." *Hickory Farms*, 500 F. Supp.

2d at 793 (quoting *Ty, Inc. v. Softbelly's, Inc.*, 353 F.3d 528, 531 (7th Cir. 2003)). "Imagine

being forbidden to describe a Chevrolet as a 'car' or an 'automobile' because Ford . . . had

trademarked these generic words." *Hickory Farms*, 500 F. Supp. 2d at 794 (quoting *Blau*

*Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986)). A generic term cannot

become a trademark under any circumstances. *Miller Brewing Co. v. G. Heileman Brewing Co.*,

561 F.2d 75, 79 (7th Cir. 1977) (citations omitted). In determining if a mark is generic, a court

may consider several forms of evidence, including the use of the term by competition, the

plaintiff's use of the term, the media's use of the term, consumer surveys, testimony from people

within the industry, and dictionary definitions. *Hickory Farms, Inc.*, 500 F. Supp. 2d at 794

(citing 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:13

(2006)).

Because Plaintiff has a registered trademark for the term "Timelines," Plaintiff's mark is

entitled to a presumption of validity. 15 U.S.C. § 1115(a). Defendant may rebut this

presumption with evidence that the mark is either generic or merely descriptive, without

secondary meaning. However, the classification of Plaintiff's marks is a question of fact, and not

16

appropriate for a summary judgment ruling, unless Defendant can demonstrate that the evidence as to Plaintiff's marks is so obvious that there is no doubt as to how the question of classification of the mark should be answered. *Packman*, 267 F.3d at 637.

Defendant first argues "Timelines" is a generic mark and cannot function as a trademark. Defendant puts forth several forms of evidence to support its claim that the mark is generic. First, Defendant presents definitions of the term "timeline" found in multiple dictionaries, contending Plaintiff's use of the term is nothing more than the dictionary definition. Generally, dictionaries define a timeline as a way in which a series of events may be displayed in chronological order. Plaintiff's website, Timelines.com, provides a way in which a user "can record the details of events [and] connect them in space and through time to other related events." (Def.'s SOF ¶ 5.) Plaintiff counters that the goods and services offered under its registered marks do not meet the dictionary definition of "timeline(s)." However, Plaintiff's goods and services at least contemplate the basic definition of a timeline, though Plaintiff expands on the concept of the basic definition through its use of an interactive, fluid website such that the term, even without the presumption of validity, might be more properly classified as a descriptive mark. This evidence weighs slightly in favor of a finding of genericness in deciding the summary judgment motion.

Defendant next asserts that Plaintiff uses the term "timeline(s)" generically on both the Timelines.com website and LifeSnapz.com website. There is evidence that Plaintiff did incorporate generic uses of the word "timeline" on its websites. Plaintiff asserts that much of those generic uses was incorporated into the Timelines.com website in order to generate an increase in traffic to its site, and that it removed the generic uses from the site after the gains in website traffic had been optimized. Defendant has not shown that Plaintiff has so repeatedly and

regularly used the term "timeline(s)" in this manner that Plaintiff has rendered it generic by its own devices. This evidence does not rebut the presumption of the marks' validity for purposes of Defendant's motion for summary judgment. *See Abdullahi*, 423 F.3d at 769 (viewing all evidence in a light most favorable to the plaintiff).

Defendant further asserts that the use of the term "timeline(s)" by third parties demonstrates the genericness of the term. Defendant notes that "[s]ince well before Plaintiff's existence, third parties have used "timeline(s)" to name and describe products and services . . . ." (Def.'s Mem. in Support of Mot. at 7.) This information cuts against Defendant's position, as that evidence demonstrates that the PTO was aware of third parties' using the term "timeline(s)" prior to the filing of Plaintiff's application for trademark protection in 2009. Despite the use by these third parties, PTO issued registration to Plaintiff. Certainly, the fact that the PTO uses the term generically on its own website indicates the PTO's awareness regarding the term "timeline(s)" and its potential generic uses, but none of this evidence goes to sufficiently rebut the presumption of the validity of the marks. Similarly, the use of the term by the media fails to rebut the presumption of the marks' validity, as the term was obviously used in common speech prior to the PTO's issuance of Plaintiff's registrations. This evidence simply indicates the PTO was aware of these other uses of the terms at issue and found that Plaintiff was not using the term in a generic manner. Moreover, these other third parties, as well as media outlets, have not used the terms in a manner similar to Plaintiff's use of the terms for brand identity and origination. Hence, this evidence does not support a finding of genericness sufficient to award Defendant summary judgment.

Finally, Defendant submits survey evidence, arguing the *Teflon* survey performed by Dr. Jay demonstrates that a majority of consumers believe the term "timeline(s)" to be generic.

Consumer surveys are yet another form of evidence a defendant may present to show a term is generic. *Hickory Farms*, 500 F. Supp. 2d at 794. A consumer survey might also be used to "show the existence of a genuine issue of material fact on the issue of genericness." *Id.* (citing *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 530 (7th Cir. 2003)). First, Plaintiff disputes the accuracy of the survey results and argues the methodology of the survey was flawed, as it was performed over the phone. *See Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, No. 09 C 2263, 2010 WL 1334714, at *2 (N.D. Ill. Mar. 31, 2010) (noting that surveys testing consumer confusion should mirror market conditions and replicate a consumer's thought process as she would encounter a mark in the marketplace). Furthermore, the results of Defendant's survey are not dispositive of the issue of genericness; while Defendant asserts that the survey resulted in 68-69 percent of respondents expressing their belief that the term "timeline(s)" was generic, 24 percent of respondents believed the term was a brand name. This evidence is not "so one-sided" that there can be no doubt as to the genericness of the terms in deciding this motion for summary judgment. *Packman*, 267 F.3d at 637 (citations and quotations omitted).

On balance, the evidence put forth by Defendant as to the genericness of "timeline(s)" is inadequate to support summary judgment on the issue that Plaintiff's marks are generic. At this stage, facts are taken in a light most favorable to Plaintiff, and Defendant has failed to demonstrate, as a matter of law, that the marks are generic. Issues of material fact remain with regards to Plaintiff's use of the term in the generic sense, as well as the accuracy of the survey submitted by Defendant.

*No Showing that "Timelines" is Merely Descriptive as a Matter of Law*

Defendant next argues Plaintiff's marks are merely descriptive and have not acquired secondary meaning. A descriptive mark "is one that merely describes the ingredients, qualities, or characteristics of an article of trade or a service." *Mil-Mar*, 75 F.3d at 1157 (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 906 (7th Cir. 1983). A merely descriptive mark is generally not entitled to trademark protection unless it acquires 'secondary meaning,' that is, when the name of the product or service becomes "uniquely associated with the original seller." *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 483 (7th Cir. 2007). Without this secondary meaning associated with a descriptive mark, the mark is not entitled to trademark protection. Proof of secondary meaning can be demonstrated with "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and evidence of intentional copying." *Packman*, 267 F.3d at 641 (citations omitted).

As explained above, the classification of Plaintiff's marks is a question of fact, and not appropriate for summary judgment, unless Defendant can demonstrate the evidence is so obvious that there is no doubt as to how Plaintiff's marks should be classified. *Packman*, 267 F.3d at 637. Plaintiff's marks are registered with the PTO and if descriptive, are presumed to have secondary meaning. *Teachbook*, 819 F. Supp. 2d at 776.

Defendant incorrectly asserts in support of its motion that Plaintiff bears the burden of showing secondary meaning. (Def.'s Mem. in Support of Mot. at 12.) This ignores the burden of the movant to demonstrate that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323-24. Defendant fails to meet its burden, simply arguing instead that Plaintiff failed to

20

demonstrate that "timeline(s)" had acquired meaning with consumers such that the term is uniquely associated with Plaintiff.

Plaintiff had more than nominal sales and over one-thousand active users on its website, Timelines.com. At this stage in the proceedings, it is not unreasonable to conclude that as to this group of users, "timeline(s)" had acquired a specific meaning associated with Plaintiff. Moreover, Plaintiff asserts its marks are even stronger than descriptive marks with secondary meaning, contending its marks are "suggestive because they stand 'for an idea which requires some operation of the imagination to connect it with the goods.'" (Pl.'s Resp. at 18 (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir. 1992) (*Sands*)).

Therefore, it is apparent an issue of fact remains as to the classification of Plaintiff's marks. Defendant's evidence as to its assertion that Plaintiff's marks are merely descriptive is insufficient to support a finding on summary judgment, and Defendant has failed to demonstrate that the marks are merely descriptive as a matter of law.

### No Showing of Facebook's Fair Use and Non-Infringement as a Matter of Law

Finally, Defendant asserts that even if "timeline(s)" is a protectable mark, Defendant's use of the term was fair use and, therefore, non-infringing on Plaintiff's marks. (Def.'s Mem. in Support of Mot. at 13.) This is an affirmative defense, "based on the principle that no one should be able to appropriate descriptive language through trademark registration." *Packman*, 267 F.3d at 639 (quoting *Sands*, 978 F.2d at 951). "To prevail on a fair use defense, a defendant must establish that: 1) it did not use the mark as a trademark; 2) the use is descriptive of its goods or services; and 3) it used the mark fairly and in good faith." *Scandaglia v. Transunion Interactive, Inc.*, No. 09 C 2121, 2010 WL 3526653, at *2 (N.D. Ill. Sept. 1, 2010) (citing *Packman*, 267 F.3d at 638; 15 U.S.C. § 1115(b)(4)).

21

Defendant asserts it did not use the term "Timeline" as a trademark. However, this is a question of fact that remains unanswered at this stage. Evidence, as discussed above, has been presented which indicates Defendant did, in fact, intend to (and does currently) use "Timeline" as a trademark. Specifically, Defendant's founder and CEO referred to "Timeline" as the company's "most important brand." (Pl.'s SOF ¶ 42; Pl.'s SOF Ex. 17.) Defendant further asserted it intended to replace its "Wall," one of Defendant's trademarks, with the "Timeline." (*Id.*) Defendant regularly referred to its "Timeline" as a product and marketed its "Timeline" in a manner that a reasonable jury might find to be trademark use. Moreover, genuine issues of material fact remain regarding Defendant's use of the term "Timeline" in good faith, as evidence demonstrates that Defendant was aware of Plaintiff's registered trademarks and Defendant's CEO commented that Defendant "wanted to punch anyone who tried to compete with [Facebook] in the face really hard . . . ." (Pl.'s SOF ¶ 26.) All of these facts could reasonably result in a jury finding Defendant's use of the term was not in good faith or a fair use of the term. Therefore, Defendant's defense of fair use fails on summary judgment, and Defendant cannot demonstrate it did not infringe on Plaintiff's marks as a matter of law.

## CONCLUSION

Defendant has failed to demonstrate as a matter of law that Plaintiff's trademarks are either generic or merely descriptive, or that Defendant's use of the term "Timeline" was a fair use pursuant to 15 U.S.C. § 1115(b)(4). Summary judgment is improper where genuine disputes of material facts exist, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Therefore, in light of the foregoing analysis, Defendant's motion for summary judgment is denied as to Plaintiff's Amended Complaint and Defendant's Counterclaims, with the exception of Defendant's Second

Cause of Action in its Counterclaim, which seeks, in part, an entry of the express abandonment of Plaintiff's PTO application, Serial No. 85/432,026. Plaintiff concedes the PTO deemed this application is abandoned; therefore, summary judgment is entered in favor of Defendant with regards to the abandonment of Plaintiff's application, Serial No. 85/432,026.

Date: __April 1, 2013__        _____

JOHN W. DARRAH
United States District Court Judge